# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| KRISTINE FRUENDT, | |
| Plaintiff, | No. 05-cv-00020-JAJ |
| vs. | **ORDER** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On February 23, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (docket number 4). The final decision of the Commissioner of Social Security is reversed and is remanded to the Commissioner to award benefits.

## I.  PROCEDURAL BACKGROUND

Plaintiff Kristine Fruendt applied for Title II Social Security benefits and Title XVI supplemental security income benefits on September 23, 2002, alleging an inability to work since February 7, 2002, due to fibromyalgia, osteoarthritis, hypothyroid, rotator cuff impingement in the left shoulder, Sjogren's syndrome, irritable bowel syndrome, and bulging lumbar discs. Ms. Fruendt's application was originally denied and was denied on reconsideration. A hearing before Administrative Law Judge (ALJ) Benjamin F. Parks was held on July 8, 2004. The ALJ denied Ms. Fruendt's appeal in a decision dated July 22, 2004. The Appeals Council denied Ms. Fruendt's request for review on December 23, 2004. This action for judicial review was filed on February 3, 2005.

## II. FACTUAL BACKGROUND

Ms. Fruendt was born in 1953. She graduated from high school and attended one year of college. (Tr. 13, 29). Ms. Fruendt is claiming that various ailments including fibromyalgia and osteoarthritis have rendered her completely unable to work since February 7, 2002. Her relevant medical history is set forth below.

### A. Relevant Medical History

On July 30, 1991, Ms. Fruendt underwent surgery on her right wrist to release her volar carpal tunnel ligament. (Tr. 276). Ms. Fruendt underwent a similar procedure on her left wrist on September 9, 1998. (Tr. 256).

Dr. Michael Brooks evaluated Ms. Fruendt for fibromyalgia on October 28, 1994. (Tr. 272–74). Ms. Fruendt complained of diffuse pain that included occipital head pain, neck pain, shoulder pain, lower back pain, and pain in her thighs and arms. (Tr. 272). Dr. Brooks noted that Ms. Fruendt had a family history for fibromyalgia; her mother and sister were previously diagnosed with the syndrome. (Tr. 272). Ms. Fruendt was diagnosed with fibromyalgia and was prescribed a regimen of physical therapy, exercise, and a low-dose of Xanax. (Tr. 274).

Ms. Fruendt sought treatment for fibromyalgia on January 3, April 4, August 1, and December 12, 1995. (Tr. 267–69). Dr. Brooks and Dr. Joseph Galles were Ms. Fruendt's treating physicians during this period. (Tr. 267–69). Drs. Brooks and Galles noted that Ms. Fruendt's condition seemed to improve with treatment. (Tr. 267–69).

Dr. Galles evaluated Ms. Fruendt on May 29, 1996, for fibromyalgia. (Tr. 266). Dr. Galles noted that although Ms. Fruendt's condition had improved with treatment, her condition had recently worsened with increased physical activity. (Tr. 266). Dr. Galles recommended that Ms. Fruendt moderate her physical activity and discontinue heavy lifting. (Tr. 266). Ms. Fruendt's condition remained relatively unchanged during this period. Dr. Brooks noted that Ms. Fruendt was "getting along reasonably well overall."

(Tr. 263). However, Ms. Fruendt's medical records indicate she was having trouble sleeping as a result of a medication change. (Tr. 262–63).

On June 11, 1998, Ms. Fruendt was evaluated by Dr. Galles for shoulder pain. (Tr. 260–61). Dr. Galles was unable to determine what portion of her pain was attributable to her fibromyalgia. (Tr. 260). Operative treatment was not recommended. (Tr. 260).

Ms. Fruendt was evaluated by Dr. Brooks for her shoulder pain on July 7, 1999. (Tr. 253). Dr. Brooks gave Ms. Fruendt an injection of Depo-Medrol and Marcaine to ease her symptoms. (Tr. 253). In a return visit on October 27, 1999, Dr. Brooks noted that the injection had seemed to alleviate Ms. Fruendt's symptoms. (Tr. 252).

Dr. Brooks evaluated Ms. Fruendt for continued shoulder pain on April 12, 2000. (Tr. 249–50). Dr. Brooks noted that Ms. Fruendt complained of fatigue, difficulty sleeping, weight gain, and continued left shoulder pain. (Tr. 250). Ms. Fruendt was scheduled for an MRI of her shoulder. (Tr. 249–50).

Ms. Fruendt was diagnosed with Sjogren's syndrome with significant dryness to the mouth and burning mouth syndrom during a September 27, 2000, evaluation by Dr. Brooks. (Tr. 247–48). Dr. Brooks noted that Ms. Fruendt complained of continued neck and lower back pain. (Tr. 247–48). An MRI and x-rays were performed. (Tr. 247). The x-rays of Ms. Fruendt's cervical spine showed some mild anterior listhesis, but did not show significant movement. (Tr. 247). Dr. Brooks noted mild degeneration in the L5-S1 facet area, but stated that "the rest of the lower back look[ed] fairly normal." (Tr. 247).

Ms. Fruendt was evaluated by Dr. Brooks on August 27, 2001. (Tr. 243). Ms. Fruendt complained of increased pain in her hands, feet, neck, and back; she was emotionally distraught when Dr. Brooks entered the examination room. (Tr. 243). Dr. Brooks noted that he and Ms. Fruendt discussed her condition at length. (Tr. 243). Dr. Brooks stated that he considered Ms. Fruendt "unable to do jobs that require[d] significant

3

amounts of lifting, bending, squatting or prolonged standing." (Tr. 243). Dr. Brooks also noted that Ms. Fruendt could not "sit for more than about 30 minutes at a time without having to move around," and would "generally have to lie down for a while fairly frequently during the day." (Tr. 243). Ms. Fruendt stated "[m]ovement of her neck and back [was] painful and use of her hands [was] painful so that heavy gripping or repetitive movements of her hands [was] contraindicated." (Tr. 243). Dr. Brooks also noted that Ms. Fruendt found standing painful to her feet. (Tr. 243).

Ms. Fruendt was evaluated by Dr. Brooks on April 22, 2002. (Tr. 239). Ms. Fruendt complained of exacerbated pain symptoms after attempting to return to half-time work. (Tr. 239). Dr. Brooks suggested that Ms. Fruendt was not going to be able to continue her current employment. (Tr. 239). Dr. Brooks noted that Ms. Fruendt was limited to "positions that do not require sitting or standing for more than about 20 minutes at a time." (Tr. 239). Dr. Brooks also stated that Ms. Fruendt's "lifting, bending and squatting" abilities were contraindicated. (Tr. 239). Dr. Brooks felt that Ms. Fruendt's work situation had exacerbated her condition. (Tr. 239). During a return visit with Dr. Brooks on July 22, 2002, Ms. Fruendt indicated that her symptoms had improved with a several-month leave from work. (Tr. 237).

Dr. Brooks evaluated Ms. Fruendt on September 18, 2002, for complaints of left knee pain. (Tr. 235). Ms. Fruendt told Dr. Brooks that six weeks prior, during a motorcycling vacation in California, she had twisted her knee while getting on to her motorcycle. (Tr. 235). Ms. Fruendt stated she felt a popping sensation as she twisted her knee. (Tr. 235). An MRI scan was taken of Ms. Fruendt's knee that revealed a torn ACL. (Tr. 234). Non-operative treatment was prescribed by Dr. David P. Hart. (Tr. 234). However, the non-operative treatment failed to alleviate Ms. Fruendt's knee pain during subsequent evaluations in October and November. (Tr. 232, 234). Ms. Fruendt underwent ACL reconstructive surgery on May 3, 2003. (Tr. 231).

4

Ms. Fruendt's medical records contain letters from Dr. Brooks to David A. Smith at the Department of Education Disability Determination Services Bureau dated October 7, 2002, and November 7, 2002. (Tr. 195, 198). Dr. Brooks's October 7 letter noted Ms. Fruendt's "consistent symptoms of pain [and] stiffness with muscular tenderness at multiple sites but primarily in the lower back." (Tr. 198). Dr. Brooks stated that a recent MRI scan of Ms. Fruendt's back revealed "a very small central disc at C5/C6 with no evidence of cord or nerve root compression and degenerative changes in the lumbar spine with left-side bulging at L5/S1 with no nerve or cord compression." (Tr. 198). Dr. Brooks also noted Ms. Fruendt's left knee ACL injury. (Tr. 198). Dr. Brooks noted that "[m]ultiple different trials of medications [had] been used over the years with limited success," and that Ms. Fruendt had received "epidural injections in the lumbar spine . . . as well as trigger point and sacroiliac injections which [had] been of some relief for her symptoms but [had] not kept her completely controlled." (Tr. 198). Dr. Brooks stated that Ms. Fruendt was forced to quit her job as a cafeteria worker because the job required "substantial lifting, bending and prolonged standing." (Tr. 198). As a result of Ms. Fruendt's symptomatology, Dr. Brooks stated that he would "limit [Ms. Fruendt] to jobs that do not require standing or walking for more than one hour at a time and no more than four hours in an eight hour day." (Tr. 198). Dr. Brooks limited Ms. Fruendt's lifting capacity "to no more than 20 pounds." (Tr. 198). Furthermore, Dr. Brooks stated: "[o]verhead use of [Ms. Fruendt's] arms [was] contraindicated because of chronic shoulder problems with rotator cuff tendonopathy. Bending, kneeling, crawling, climbing and stooping are contraindicated because of [Ms. Fruendt's] arthritis in [her] knees and lower back." (Tr. 198). Dr. Brooks stated that Ms. Fruendt's ability to sit was unlimited, but that "she should be allowed to stretch at least once an hour." (Tr. 198). Dr. Brooks noted that Ms. Fruendt's "[h]andling, seeing, hearing, speaking and traveling [were] not otherwise limited." (Tr. 198).

5

Dr. Brooks's November 7 letter stated that Ms. Fruendt carried "a diagnosis of osteoarthritis with mechanical lower back pain and associated fibromyalgia." (Tr. 195). Dr. Brooks noted that Ms. Fruendt had received "multiple modalities of therapy for chronic pain," which included "epidural and sacroiliac injections as well as trials of multiple nonsteroidals, analgesics and other agents directed at her fibromyalgia." (Tr. 195). The November 7 letter restated Ms. Fruendt's work difficulties and noted that "[p]hysical therapy and adjustments in [Ms. Fruendt's] lifestyle [had] been made." (Tr. 195). Dr. Brooks limited Ms. Fruendt's lifting ability "to jobs that do not require lifting of more than 10 pounds frequently and 20 pounds infrequently." (Tr. 195). Dr. Brooks noted limitations on Ms. Fruendt's standing, walking, sitting, stooping, climbing, kneeling, and crawling abilities that were the same as the limitations outlined in his October 7 letter. (Tr. 195).

Ms. Fruendt was evaluated by Dr. Brooks on May 21, 2003, for continuing chronic pain. (Tr. 164). Dr. Brooks elected to give Ms. Fruendt bilateral SI joint injections. (Tr. 164). Dr. Brooks also noted that Ms. Fruendt had "previously had epidural injections," that were "no more effective than the SI joint injections." (Tr. 164).

Dr. Brooks completed a questionnaire submitted by Ms. Fruendt's counsel, Mr. Jeffrey P. Berg, on June 2, 2003. (Tr. 219–23). Dr. Brooks stated that he had treated Ms. Fruendt since 1994 and that she suffered from fibromyalgia, lower back pain, osteoarthritis, hypothyroidism, and a recent ACL injury. (Tr. 219). Dr. Brooks noted that Ms. Fruendt was not a malingerer. (Tr. 220). Dr. Brooks also noted that Ms. Fruendt's pain would occasionally interfere with her attention and concentration at work, but that she was capable of low stress jobs. (Tr. 221). Dr. Brooks stated that Ms. Fruendt could sit for up to an hour, stand for up to thirty minutes, would need a job that permits shifting positions at will, and would need to take infrequent unscheduled breaks during a normal eight hour workday during which time she would have to sit quietly. (Tr. 221–22). Dr.

Brooks felt that Ms. Fruendt would likely miss approximately one day of work per month as a result of her impairments and/or treatment. (Tr. 223).

Dr. Brooks evaluated Ms. Fruendt for continued lower back pain on November 5, 2003. (Tr. 150–51). X-rays of Ms. Fruendt's lumbar spine showed "significant degeneration at the L4-L5 and L5-S1 discs and associated facet joints." (Tr. 151). Dr. Brooks felt that most of Ms. Fruendt's pain was "coming from her lower facet and disc area." (Tr. 151). Dr. Brooks elected to give Ms. Fruendt an SI joint injection to help alleviate her symptoms. (Tr. 150).

Ms. Fruendt was evaluated by Dr. Brooks on March 8, 2004, for chronic pain syndrome and osteoarthritis. (Tr. 347). An MRI of Ms. Fruendt's back "showed no evidence of nerve root or [spinal] cord compression." (Tr. 347). Dr. Brooks noted that the sacroiliac joint injections he had administered had not been effective. (Tr. 347). Dr. Brooks referred Ms. Fruendt to a physical therapist and to the Pain Clinic for further treatment. (Tr. 347).

## B. Hearing Testimony

At the hearing before the ALJ on July 8, 2004, Ms. Fruendt testified that she was fifty years old, had completed one year of college, and had ceased full-time employment as a cafeteria worker in a Cedar Rapids, Iowa, middle school, in February 2000. (Tr. 27–29). Ms. Fruendt testified that she ceased full-time employment because of recurring pain. (Tr. 29). She testified that she could not stand for long periods of time, that she had problems with her lower back, and that arthritis affected her ability to grasp objects with her hands. (Tr. 29). Ms. Fruendt stated that work exacerbated her symptoms. (Tr. 29).

In regards to her back pain, Ms. Fruendt stated that it is bilateral and spreads from her back to her legs. (Tr. 30). She stated that she was taking 200 milligrams of Celebrex twice-a-day to alleviate her symptoms. (Tr. 31). Ms. Fruendt also stated she was taking the anti-depressants Alprazolam and Nortriptyline. (Tr. 31).

7

Ms. Fruendt also testified extensively as to her daily activities. (Tr. 32–33). She stated that she usually awakens at 6 am, gets her daughter ready for school, and then goes back to bed for approximately an hour. (Tr. 32). She stated that she goes to a gym to work out approximately three times per week for about an hour-and-a-half per session. (Tr. 32). Ms. Fruendt stated that she usually lifts weights and either walks on a treadmill or rides a stationary bicycle during her work-out sessions. (Tr. 32). Ms. Fruendt stated that upon her return from the gym, she rests, fixes lunch, and then cleans her house. (Tr. 32). She stated that she can usually only undertake approximately 15 minutes of house work before she has to rest. (Tr. 32). Ms. Fruendt stated that she and her husband watch television together when he returns from work in the evening and that she usually prepares dinner. (Tr. 32–33). Ms. Fruendt testified that she usually goes to bed at approximately 10:30 pm, but wakes up approximately two to three times per night. (Tr. 33). She also stated that she is no longer able to undertake yard work. (Tr. 33). Ms. Fruendt stated that she originally sought treatment for her pain to rule out fibromyalgia because her mother and sister suffer from the affliction and her brother suffers from rheumatoid arthritis and scleroderma. (Tr. 34). Ms. Fruendt stated that she was not seeking psychiatric treatment for her depression. (Tr. 39).

Ms. Fruendt's husband also testified at the July 8 hearing. (Tr. 46). Mr. Fruendt stated that his wife had difficulty multi-tasking, is often irritable, and does not sleep well at night. (Tr. 46–47). Ms. Fruendt acknowledged her irritability, but stated that much of it was alleviated by not working. (Tr. 48).

Vocational expert Brian Paprocki also testified at the hearing before the ALJ. (Tr. 52). The ALJ presented Mr. Paprocki with a series of hypotheticals. The first hypothetical claimant was a person of Ms. Fruendt's age, education, and physical ability with a mental RFC of mild for daily living activities, mild for social functioning, mild for simple, repetitive, one- or two-step tasks, and moderate in terms of concentration for

complex and detailed instructions. (Tr. 52). Mr. Paprocki stated that such a person could find employment in the national economy as a light cleaner, office helper, or laundry folder.[1] (Tr. 52–53).

The next hypothetical the ALJ presented to Mr. Paprocki had light limitations on stooping, crawling, and bending, could stand or walk for two hours at a time, could sit for a half-an-hour at a time, had a mental RFC of mild for daily living activities and social functioning, but moderate for concentration, persistence, and pace. (Tr. 53). Mr. Paprocki stated that a person with a moderate mental RFC for concentration, persistence, and pace would have trouble approximately 40%–50% of the time with simple, repetitive tasks of a one- to two-step nature. (Tr. 53). Mr. Paprocki stated that such a person would have difficulty holding employment. (Tr. 53).

Mr. Paprocki was questioned by Ms. Fruendt's counsel, Mr. Berg, during the hearing. (Tr. 54). Mr. Berg noted that Dr. Brooks had stated that Ms. Fruendt could only use her hands 25% of the time for grasping, turning, and twisting, her fingers 25% of the time for fine manipulation, and could only reach overhead 25% of the time. (Tr. 54). Mr. Paprocki stated that such a person probably could not undertake the positions he had listed in response to the ALJ's first hypothetical, but could probably undertake sedentary work. (Tr. 54–55). However, when questioned by Mr. Berg about whether a person could perform sedentary work if they could only function at a slow pace for up to a third of the day, Mr. Paprocki stated jobs of such a nature do not exist. (Tr. 55).

---

[1] Mr. Paprocki stated that there were: 2,000 persons employed as housekeeper/light cleaners in the State of Iowa, and 350,000 persons so employed in the United States; 400 persons employed as office helpers in Iowa and 110,000 persons so employed in the United States; and 400 persons employed as laundry folders in Iowa and 40,000 persons so employed in the United States.

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
>
> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ determined that Ms. Fruendt had not engaged in substantial gainful employment since February 7, 2002. (Tr. 17). At the second step, the ALJ determined that Ms. Fruendt had the following impairments: fibromyalgia, lumbar back pain, arthritis, chronic lumbar strain, and hypothyroidism (Tr. 17). At the third step, the ALJ determined that Ms. Fruendt's impairments were not equivalent to one of the listed impairments. (Tr. 17). At the fourth and fifth steps, the ALJ determined that Ms. Fruendt was unable to perform her past relevant work as a

cafeteria worker and crossing guard (Tr. 18), but was able to make a vocational adjustment to work that exists in significant numbers in the national economy. (Tr. 18). Thus, the ALJ concluded that Ms. Fruendt was not "disabled." (Tr. 18).

### C. Credibility Determination

Ms. Fruendt claims that the ALJ's analysis under the standard set forth by the United States Court of Appeals for the Eighth Circuit in Polaski v. Heckler, 739 F.2d 1320, 1321–22 (8th Cir. 1984), was flawed. Ms. Fruendt also claims that the ALJ failed to properly evaluate her credibility according to the Polaski standard, erred in rejecting Dr. Brooks's opinion regarding Ms. Fruendt's ability to work, and did not properly set forth Ms. Fruendt's limitations in the hypothetical claimant presented to Mr. Paprocki. The Commissioner rebuts Ms. Fruendt's claims and states that the ALJ properly considered Ms. Fruendt's credibility and her ability to obtain other work in the national economy.

Relying on the record as a whole and the testimony of the vocational expert, Mr. Paprocki, the ALJ determined that Ms. Fruendt's case satisfied the fourth step of the Polaski standard because she could not return to the work she had previously done. Thus, Ms. Fruendt's argument, and the Commissioner's resistance, are premised on the ALJ's determination that Ms. Fruendt could make a vocational adjustment to a field of work that exists in significant numbers in the national economy.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard complaints "solely because the objective medical evidence does not fully support them." Polaski, 739 F.2d at 1322. Furthermore, "[t]he [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating a claimant's subjective impairments, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage,

effectiveness, and side effects of medication; and (5) functional restrictions.  Id. at 1321–22.  Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole.  Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Where an ALJ seriously considers, but for good reason explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

While the ALJ determined that Ms. Fruendt is limited by her ailments, he stated that Ms. Fruendt's admission that she works out three times a week for up to an hour-and-a-half per session was inconsistent with her claimed inability to work.  (Tr. 16). Furthermore, the Commissioner claims Ms. Fruendt's motorcycle trip to California, and her subsequent knee injury, impugns her credibility.  The incident took place after Ms. Fruendt had stopped working.  This court ventures to say that riding a motorcycle is at least, if not more, physically strenuous than Ms. Fruendt's past relevant work as a school cafeteria worker.  However, neither of these instances presents a situation that this court feels seriously impugns Ms. Fruendt's credibility.  Ms. Fruendt's ability to exercise or ride a motorcycle does not automatically mean that she can perform work in the national economy.  Furthermore, Dr. Brooks had prescribed a regimen of exercise as part of Ms. Fruendt's fibromyalgia treatment.  The Commissioner has not proven that the Ms. Fruendt's medical records are replete with inconsistencies that would raise serious doubts as to her credibility.

Ms. Fruendt also claims that the opinion of her treating physician, Dr. Brooks, is consistent with a total inability to work.  However, Dr. Brooks never stated that Ms. Fruendt is totally unable to work.  Dr. Brooks imposed certain limitations on Ms. Fruendt's ability to work.  The ALJ did not agree with Ms. Fruendt's position and instead found that the limitations imposed by Dr. Brooks, while significantly limiting the types of work Ms. Fruendt could perform, did not rise to a level of total inability to work.  Ms.

13

Fruendt claims that as a result, the ALJ discredited Dr. Brooks's opinion. This court does not find that the ALJ discredited Dr. Brooks's opinion.

Dr. Brooks set forth limitations on Ms. Fruendt's physical activity in letters dated October 7 and November 7, 2002, and in a questionnaire submitted by Ms. Fruendt's counsel, Mr. Berg, on June 3, 2003. Dr. Brooks did not declare Ms. Fruendt unable to work in any of these documents. Dr. Brooks's limitations were specified work limitations. In his October 7 letter, Dr. Brooks stated that he would "limit [Ms. Fruendt] to jobs that do not require standing or walking for more than one hour at a time and no more than four hours in an eight hour day." (Tr. 198). In the June 3 questionnaire, Dr. Brooks stated that Ms. Fruendt could sit for up to an hour, stand for up to thirty minutes, would need a job that permits shifting positions at will, and would need to take infrequent unscheduled breaks during a normal eight hour workday during which time she would have to sit quietly. (Tr. 221–22). All of Dr. Brooks's comments were in relation to work limitations. However, in no part of his opinion does the ALJ question Dr. Brooks's credibility. In fact, the ALJ relied heavily upon the limitations Dr. Brooks imposed on Ms. Fruendt in formulating his opinion. Thus, Ms. Fruendt's claim that the ALJ discredited Dr. Brooks's opinion lacks merit.

### D. Improper Hypothetical

Ms. Fruendt claims that the hypotheticals presented by the ALJ to Mr. Paprocki were improper because they did not properly set forth the limitations Dr. Brooks had imposed on Ms. Fruendt. This court agrees.

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263–64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 668, 694–95 (8th Cir. 1996).

14

The question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ. Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

The ALJ presented two hypotheticals to Mr. Paprocki. Mr. Paprocki listed possible relevant work for the first hypothetical. However, the second hypothetical was more analogous to the limitations Dr. Brooks imposed on Ms. Fruendt. Mr. Paprocki stated that a person with the limitations outlined in the second hypothetical would have difficulty obtaining work in the national economy. In his decision, the ALJ presented limitations analogous to those presented in the second hypothetical, but stated that the jobs listed by Mr. Paprocki would be available to a person of such limitations. (Tr. 16–17). This contradicts the testimony presented at the July 8, 2004, hearing. Mr. Paprocki stated that a person with limitations such as those presented by the second hypothetical and set forth by Dr. Brooks could not find work in the national economy.

### E. Reversal or Remand

The scope of a district court's review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g), which provides, in part, that:

> [t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The United States Court of Appeals for the Eighth Circuit has stated that:

> [w]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

Gavin, 811 F.2d at 1201–02. See also Beeler v. Brown, 833 F.2d 124, 127 (8th Cir. 1987) (although there was no shift in the burden to the Secretary, reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of

15

disability"); <u>Stephens v. Sec'y of Health, Educ., & Welfare</u>, 603 F.2d 36, 42 (8th Cir. 1979) (reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled).

Because this court does not believe that the Commissioner raised sufficient inconsistences in the record to impugn Ms. Fruendt's credibility and finds that the ALJ misstated Mr. Paprocki's findings during the July 8, 2004, hearing, in his July 22, 2004, decision, this court finds that the record supports a finding of disability.

Upon the foregoing,

IT IS ORDERED that this matter is reversed and is remanded to the Commissioner of Social Security to award benefits.

November 4, 2005.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT